We will now hear argument in the case of Baroni v. Wells Fargo Bank et al. And I hope, counsel, that you were made aware of the fact that the court prefers to hear the 55150 first, only because that was the first in time, and then we will go to our number 55076. Were you all advised of that? Did that get to you? Okay, good. Yes, Your Honor, but I'm not sure now. The conversion order actually came down first, and the turnover order followed the conversion order, but I'm happy to start with the turnover order. If you will, just humor us on this. Absolutely. It would be helpful for us to do it in this order. It won't have any impact one way or another on the outcome. It just helps us in terms of our analysis. Great. Let's start then, 1150, and I believe that Mr. Hayes, is that you, Mr. Hayes? Yes, Your Honor. You're going first, and as I understand it, just looking at the timing here, you have the full 15 minutes, I believe, and then thereafter, I guess Ms. Chilton and Mr. Deek are going to each have seven minutes. Is that correct? Good morning, Your Honor. This is Kyle Deek here on behalf of the Appellee of the Bank of New York, Melanie's trustee. I will probably take the balance of the time for argument, Your Honor. Mr. Chilton and I discussed beforehand. Obviously, I would defer to him with regard to any specific questions for his client, Wells Fargo, but I will lead the argument and take the balance. Okay, very well. All right. Thank you, Your Honor. Okay, let's start then with you, Mr. Hayes. Please proceed. Thank you, Your Honor. May it please the Court, I'm John Hayes, Resnick Hayes Marotti for the debtor, Mrs. Barone. I'd like to start my comments with, you know, what we read all the time in a court of appeals opinions, that this case starts with the plain language of the code, of the bankruptcy code. Section 1141B says, unless otherwise set forth in the plan, a confirmation of a Chapter 11 plan revests all property in the debtor. That's what the plan said. 1141C says that, unless otherwise set forth in the plan again, all property dealt with by the plan is free and clear of all claims of creditors. The plan was confirmed over the objection of the banks, by the way. It was hotly contested. And as Judge Barry said, and frankly, as I've told hundreds of people, when a Chapter 11 plan is confirmed, the property that was in the estate. Counsel, I need to interrupt you. Our intention was to have you argue the conversion case first, which, based on my review, is the case ending in 150. And I think we may have given you a miscue. Yes, you know, that's why I wonder, right, the conversion, what we were told ahead of time was that it would be the turnover order. At least that's what I heard. But, you know, it makes sense now, because the bank attorneys are the appellees, not the trustee. All right. So let me focus on the conversion order then. I wanted to start the conversion order with three really quick factual points. In the two years I've been involved in this case, every single pleading that the banks have filed, every pleading that the trustee has filed, start with Mrs. Barone didn't make a single payment to anybody throughout the five or six years of the plan. That's not only false, it's absurd. She paid more than a million dollars into four reserve accounts that were set up by the plan, and she turned over more than $600,000 of that to two of the creditors, and she turned over more than $500,000 of that to the trustee after the case was converted to Chapter 7. The second quick point is that I'm a little concerned about the litigation, the sense of the litigation. The litigation against the banks was never about I want a free house, I shouldn't have to pay these debts. The banks have no liens. What it was about is who is identified, who actually holds the note, who actually do I make the payments to. And that started when she got demands on one of the properties from two different banks saying you owe us this money. She started investigating, and that's how the litigation started. Counsel, could you cite what portion of the record would contain her communications to the court, to the banks, or whomever that says basically I've got this money, I want to pay it, I don't know to whom to pay it. Are there documents like that in the record? No. Those are the adversary proceedings. No, they're not in the record. There were four adversaries. So you just told us that that's what she wanted to know. Did she ask anybody? Pay the money to them? I can't say. I wasn't involved in the adversary proceedings. Personally, I just came in for the appeals. So the bottom line is when you say she didn't know who to pay it to, we don't know one way or another whether she wanted to pay it or would have paid it. It's just a vacuum, right? Well, for purposes of today, yes. The reason I raise the point, though, is this has been going around a lot where people attack banks and say, oh, I shouldn't have to pay you because there was some issue, so I should get a free house. And that is absolutely not what was going on here ever. And actually that leads to – The problem is for us is that the plan anticipated she was going to have her conflict with the lender and figure all those questions out in the adversary proceeding. And then if she lost, the plan says all this money you're paying into reserve, you've got to pay to the lender. Because if you lose your claim, they're entitled to the money. So at that point, there's no question who gets the money. So the problem for us is she didn't do it. She didn't follow the plan. She lost the adversary. She didn't pay the money. So I guess I'm interested in our legal standard is did the bankruptcy court have cause to do the conversion? She's not following the plan. It's more than once that she isn't following the plan. So how is there not cause to do this conversion? The basis for the conversion was that there was a material default of the plan. And as to the motion that led to the conversion, she had received a 1099 from the bank. She actually got it from the IRS. But a 1099-C is a statement to the IRS. It's called cancellation of indebtedness. This loan, there's cancellation of indebtedness. There's no debt anymore. And she asked them the questions about it. She asked them, what's going on with this? The money was sitting in the reserve account, $234,000. I have $274,000. And she said, I know I'm supposed to pay you. What about this 1099-C? Can we work this out? Can you let us know? And her answer was, you figure it out. We're not telling you. And so the basis was is that a material default of the plan. So my first response is it's not – I mean, it's a large number. There's no doubt about that. But the plan had nine classes. It had four reserve accounts. It had a lot of moving parts. What the default was is the failure to transfer funds sitting in a reserve account on a particular day. And she offered at the hearing – I mean, I was there for that. She offered – well, she offered to make the transfer right now or the next day. The money's sitting there. I'll do it. It could easily be cured. I think that raises a question whether it was a material default. Wasn't that after – that was after several efforts had been made and some fairly significant time had passed since the adversary was resolved. So, sure, it all gets queued up. The bank is tired of waiting, so has a hearing with the bankruptcy court, and then at that moment she's going to pay? I mean, I think I understand why the lenders are a little dissatisfied with that because she could have paid months before and just didn't. Well, as to this loan again, her view was it might have been canceled. If the bank told the IRS $600,000 worth of debt has been canceled and she has to report that as income, which is why they have the 1099-C, then to me it sounds like it's reasonable to ask. But you're right, a few months had gone by, and there were conversations back and forth. I want to make sure I really still owe this money based on these 1099-Cs. Can you let me know? And they sort of said, we're tired of talking to you. We're not going to answer that question. But, again, the default was the transfer of the funds, not the failure to pay into the reserve account for six years. Is it your view that as long as she paid into the reserve fund, even if she never paid anything to the bank, that she was in compliance with the plan? Oh, no, no doubt about it, Your Honor, that she was supposed to transfer the money. She was prepared to transfer the money. She had one more question. The court lost it, basically. The banks filed this little bitty motion, three pages with one little page of law, saying we've lost it, too. It's time to convert this case, which the result of converting the case, if the turnover motion doesn't work, if the trustee is right about the turnover motion, she loses her home and two rental properties and about $400,000 of proceeds from one property she sold. She loses all of that because she didn't turn over, she didn't transfer the funds. And her reason is, well, I had one more question. And if the court says, well, that's not reasonable, fine, I'll turn it over right now. That's an abuse of discretion in our view. What is your best case that would confirm that a bankruptcy judge who doesn't agree with your client's position is abusing his or her discretion? I haven't seen any cases that have similar facts six years after the plan's confirmed. It seems to me that the cases that are out there show that the bankruptcy courts have enormous discretion. And in this case, there's been lots of back and forth and litigation. It seems that the banks had every reason to think that they really couldn't have confidence that your client was going to pay. How long were they obliged to wait? And eventually, the bankruptcy trustee, having reviewed the facts and the circumstances, concluded that that was enough. How's that an abuse of discretion? Because of the result. And by the way, under 1112, Judge Barish was supposed to consider whether to dismiss or convert. Dismissal, they still could have, they would have gotten the money. But to dismiss or convert, he's supposed to consider the rights of the debtor and balance whether dismissal or conversion. And in your view, there's no evidence that he did so? He did discuss it at the hearing. And what does he have to do, write a treatise? It's the end result, Your Honor, the result of the... You don't like his reasoning, I get that. But when you say that he has to consider these things, you say he discussed it. I'm struggling with the idea that somehow that was not done here. That he failed to comply with what the statute requires. What am I missing? Well, if I could put it this way, perhaps. If he had said, I'm going to sanction you $25,000. I'm going to dismiss your case. Good luck with all these people. I'm going to something else. What he said was, you're going to lose your home, two rental properties, and $400,000. Because you went to the well one too many times and asked one too many questions. That's where the abuse of discretion is, Your Honor. Was he not considering, though, the rights of the creditors? Well, our view is that's all he considered. He said, they're frustrated, I'm frustrated, this is it, let's get a trustee. And if that means you lose all of your property, well, sorry, you went to the well one too many times. And that's where the abuse of discretion comes in. Do you want to save any of your time? Yes, if I could save the rest of my time, thank you. Very well. All right, I think, was it Mr. Deek or Mr. Chilton said you're going to cover on this? It was Mr. Deek, Your Honor. Very well. You want to proceed then? You'll let us know when Mr. Chilton is coming here. Mr. Chilton will let us know. Yes, Your Honor. And may it please the Court, my name is Kyle Deek, and I'm here on behalf of the appellee of the Bank of New York Mill as trustee in this case. I think Your Honor's comments toward the end are really the gravamen of this case and of the appeal before this Court. And that is, did the Bankruptcy Court, as reviewed by the District Court, abuse its discretion in finding that it was proper to convert this case from a Chapter 11 to a Chapter 7 based upon the facts that were before the Court? And looking further at the standard that's before this Court, was or were any of the findings that the Bankruptcy Court used, once again as reviewed by the District Court, to support conversion illogical, implausible, or not supportable or supported by the facts in the record? And I think undeniably the answer to that question is no. That everything that was set forth by the Bankruptcy Court as shown and as further exemplified by the District Court shows that there was absolutely no abuse of discretion in this case. I guess what I struggle with is that obviously this was going to be an important case because we're saying this constitutes a material default. Wouldn't this set a new and rather extreme standard for nonpayment without an opportunity to cure? I don't think so, Your Honor, for a number of reasons. Not the least of which is this debtor already had an opportunity to cure. And as Mr. Chilton can discuss with regard to his client, this is not the first quote-unquote bite at the apple. Unfortunately, the debtor got caught with her proverbial hand in the cookie jar too many times. She had gone down this path with Wells Fargo previously, by which she made arguments that she did not have to pay in terms of the confirmed plan that she herself put forward to the court. Is that the one that was appealed all the way to the Supreme Court? So the Bank of New York issue was appealed all the way to the Supreme Court. I'm not sure how far the Wells Fargo issue went. And again, Mr. Chilton can speak directly to that. I do know that the Bankruptcy Court in the transcript of the hearing specifically addressed the fact that an argument had been made previously by Ms. Barone with regard to her obligations under the plan to make a payment on an allowed claim to Wells Fargo in similar fashion to the argument that she was making here with Bank of New York Mellon, that the court had addressed that, had found, and I believe the judge's comments were, is that they were nonsensical. Her arguments with regard to that, and had given Ms. Barone a six-day cure period with regard to the Wells Fargo payment to cure it, which she did. And so when the issue came up for a second time before the court, with regard to Bank of New York Mellon, in the posture that it was sitting, which was at that point six months past the payment date, and again, pursuant to the terms of the plan, which is set forth in the excerpt from the record on pages 281 and 293, Ms. Barone's obligation was to make the payment for the funds that had been escrowed within ten business days of a final non-appealable order with regard to the allowance of the claim. Ms. Barone exercised... Again, to try to put my head in Judge Marash's head, he sees a, I gather at this point, a multi-year litigation when Ms. Barone contended she was not obligated to pay anything more. There had been delay, after delay, after delay, after delay, and finally a last warning, and he just had it. And that equals abuse of discretion. He did not abuse his discretion, right? I would submit yes, because it wasn't that he just had it. I think it was that he was identifying the pattern in practice throughout the case. There's no question that Ms. Barone exercised all of her respective rights over an extended period of time to try to combat the claim of my client, the Bank of New York Mellon, in this case. She initiated an absence of proceeding in 2013, which led to a summary judgment order in 2016. That summary judgment order in favor of my client and for allowance of the claim was appealed to the district court. The district court affirmed that in later part of 2016. That issue was appealed to this court. This court affirmed that sometime thereafter. It went up to the Supreme Court on a petition for writ of certiorari. The Supreme Court denied that in October of 2018. So over a period of five or six years, she exercised all of her rights. But when the final hammer dropped, she was obligated to go ahead and remit those funds within 10 business days. That would have been October 23rd of 2018. By the time after two warnings from counsel that we need to make payment, we need to make it go forward in late December of 2018 and January of 2019, my client had no choice but in March of 2019, now almost five, six months past the due date, to file the motion to convert the case to Chapter 7K. So you have that factual scenario. It wasn't a day. It wasn't a week. It wasn't even a month. It was half a year after payment was due. At that point, almost a quarter of a million dollars had accrued in payments. So that is the underlying factual basis, again, coupled with the history with regard to Wells Fargo and engaging in very same dilatory tactics that the court was looking at when it said, undeniably, there's a material default with regard to the case under 1112B4N that warrants conversion of this case to a Chapter 7. Why didn't somebody tell her what the 1099 meant? I don't know the answer to that question. I know there was discussion, Judge Kelley, at the hearing with regard to what the numbers meant in the 1099 with regard to forgiveness and certain additional interest or whatnot. I don't know why someone didn't do a particular thing. That would have been income to her, wouldn't it? I believe under the IRS code, yes, forgiveness of debt can potentially be income for her. But that, I would tell you specifically, Judge Kelley, that issue was addressed by the bankruptcy court specifically. If you look at excerpts from the records, looking at pages 396 and 97 and then continuing on to pages 399, the bankruptcy judge specifically asked this question. He said, Counsel, isn't it as simple as this? You are obligated under the plan to make the payment after a final non-appealable order. Counsel responded, yes. Counsel, do you contend, or do you concede, I should say, that your client did not make the payment? Yes, I agree with you that my client did not make the payment. Counsel, let me ask you this question. This appears, again, around 396 through 399 of the excerpts from the record on appeal. Can you set forth any reason under law that would have absolved your client of the ability to pay? Counsel said, honestly, no. I don't have any reason under law that my client was absolved of their obligation to pay under the confirmed plan. Counsel then went on to say, but we've got this issue with the 1099-C, as you referenced, Judge Kelly. And the judge said, well, let me ask you this question. He said, what did you do about that? And Counsel said, well, honestly, and I'm paraphrasing, we really didn't do anything about that. We asked the question, but we didn't exercise any legal rights or remedies. We didn't try to discover in the course of the adversary proceeding. The judge went further on in the transcript to say, well, you had every opportunity through a course of period of years to go on and to investigate that, to talk about that, to do something about that if that was a serious concern or issue of yours. And you did nothing legally to try to figure out answers to your question other than informally asking a question that you say you did not get a response to. And the answer at the end of the day from Counsel was, well, you're right on that, Judge, you're right. We didn't do anything legally other than ask questions informally to which we allegedly didn't get any responses. And the court said, that doesn't absolve you of your obligations under the plan. You've told me nothing from a legal standpoint that would have excused your repeated now, again, because we have Wells Fargo in the rearview mirror, your repeated noncompliance with the terms of the plan, again, that you put forward that this court confirmed. And so when you look at the totality of the circumstances that the court was looking at, there's no question, I think, and it's undisputed that the borrower never made the payment, that there was a material default under 1112B4N, warranting of cause for moving forward with conversion in this case. The other issues, obviously, as the District Court looked at and the Bankruptcy Court as well, is there are savings provisions in the statute under 1112B2 with regard to conversion. The court, I'll say summarily and happy to take any questions on it, but the court observed that there were no unusual circumstances in this instance, that there was no reasonable justification at the end of the day for withholding the payment. I'm going to jump in on this, I guess, and I failed to ask your colleague. How is it in the creditor's best interest to do this conversion where she is at that hearing, she's saying, I'll give you your check today, we do the conversion, and there's additional administrative fees for the bankruptcy process, and so perhaps we're depleting the estate from what the creditors are going to get at the end of the day. So how is it better for the creditors to do this conversion? To answer your question, Your Honor, first, I would dispute, I've read through the record, I've read through the transcript, I don't see anywhere in the transcript of the hearing where Ms. Barone testifies, I've got the money, I'm willing to take that. The only statements you see at the hearing is with regard to counsel saying, well, we can make the payment. And what the court said specifically to that point was, I've got no evidence before me. You've not put forth an affidavit or a declaration or any type of evidentiary support to suggest that she could or would, the judge's words, could or would make that payment. Did Ms. Barone have total control over the reserve account? She was the dispersing agent, I believe is the word, dispersing individual with regard to the provisions of the plan. So I don't know logistically whether or not she actually physically or was with control of counsel, but she was, I think, identified the debtor, was identified as the dispersing agent or dispersing individual under the terms of the plan itself. Having said that, again, with regards to the issue of cure and the like that Your Honor brought up, there's absolutely no evidence on the motion other than counsel's argument. As we know, argument of counsel is not evidence. And the court specifically noted there's no affidavit, there was no declaration, there's nothing in the record supporting the fact that she would actually pay the monies. The court said quite to the contrary. The history and the evidence in the case are all suggestive is that she wouldn't actually do that. She hasn't. She hadn't at that point in time, which was six months past the due date. Remember, we're at a motion. The motion was filed in beginning of March of 2019. The hearing was a month later, at the beginning of April, April 9th of 2019. A month after the motion was filed, she still hasn't disbursed the funds. Okay? A couple of years ago. Counsel, let me just ask you this. Obviously, counsel was at the hearing in the motion. I gather that Ms. Veroni wasn't there in person and would not have been able to testify in any event, right? I don't know that factually one way or the other, Your Honor. So the reason I ask that is it was a suggestion that she was there and offered. At least that was my understanding, that she said, I've got a check here I'm ready to pay. There's nothing like that in the record, right? That's my point, Your Honor. There's nothing in the record to suggest that. I was personally not at the hearing, but I've read through the entire record in this case. I've read through the entire transcript before the bankruptcy court, and there is nothing suggestive of that hearing that she was there, that she would have testified, that she did testify. The only statements with regard to payment or the ability to pay were, again, arguments of counsel, not evidence submitted on the record. The record is completely devoid of that, which is, again, further evidence of the fact that cause existed, that there were no unusual circumstances, that none of the safe harbor provisions under 1112B2 come into play in this instance, which would absolve the debtor of her responsibilities and would undermine the court's reasoning or rationale with regard to the conversion of the case from a Chapter 11 to a Chapter 7 case. So, again, Your Honor, for all of those reasons, for all of the issues that the court looked at, and I've got one minute left, Your Honor, I want to touch one last question that Your Honor had with regard to the interests. What the court observed, and I think rightfully so, is that it had been, this was a five-year plan, at the point of the hearing, which was at year six. The borrower had not made a motion for case closure. The borrower was still actively engaged in litigation with creditors. In fact, the day of the hearing on the motion to convert, the debtor had filed yet another adversary proceeding against my client, the Bank of New York Mill. And what the court, I think, had at hand and was readily observable was that there was no guarantee that allowing the debtor to remain in control of this case would be a swift and quick resolution of the case. I think what the court saw and said was that allowing a trustee to get involved, especially in light of the fact that all of the majority of the claims allowance process had already been dealt with and come to final fruition, was evidence in and of itself that it was in the best interest to move forward. So, again, Your Honors, for all of those reasons, I'm happy to answer any questions, but we'd ask that you affirm both the bankruptcy court and the district court's reasoning. Any questions by my colleague? All right. Thank you very much. And I gather that, Mr. Chilton, you agree with your co-counsel's statements. I certainly do, Your Honor. Thank you. Very well. Thank you. All right. Mr. Hayes, you have a little rebuttal time. Thank you, Your Honor. Your Honor, I was not at the hearing on the motion to convert either, but I absolutely guarantee you that Ms. Barone was there. She's been to every single hearing throughout. And you base that on what? Only the fact that, I mean, she's listening right now. She's been to every single hearing that I've been involved in for two years, and it's incomprehensible that she wouldn't have been there. Secondly, the new adversary proceeding that was filed that day was over the 1099s, whether that reduced the amount that she was required to pay. And by the way, I'd like to say that Judge Barish commented at the motion to convert hearing that a status report had been filed by Ms. Barone a month or so earlier that showed the money in the reserve accounts in the status report. Counsel, this is a question, though. The money was there, had been there for some time, but she didn't pay it. She wouldn't pay it. There was just litigation and delay and delay and delay and delay, and the court finally said, you know, that's enough. Isn't that what we're really dealing with here? Well, yes, but if Judge Barish had said, look, I'm going to sanction you $500,000. You said that before. You said a smaller number, but the reality is he didn't do that. The question is whether he abused his discretion by doing what he did. By saying that she loses her home and the two rental properties and $350,000 in the bank. She was aware of that from the beginning in connection with the plan, and the allegation is, and apparently the proof, is that she did not follow the plan. So that was a risk that she took, and that was a personal decision, presumably. Any other questions of Mr. Hayes by my colleague? No, thank you. Very well. Okay, so we're going then to conclude the hearing on 55150. We thank counsel for their argument, and now we're going to go.
judges: Kelly, SMITH, FORREST